**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:06-cr-202 |
| v. | : | Judge Holschuh |
| JOSEPH M. JONES, | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On November 7, 2006, a grand jury returned a Superseding Indictment (R. at 26) charging Defendant Joseph M. Jones with distribution of, possession of, production of, and publishing notice of child pornography. This matter is currently before the Court on Defendant's Motion to Suppress Physical Evidence Seized from Both His Home and Vehicle. (R. at 22). The Court held an evidentiary hearing on Defendant's motion, which began on November 13, 2006. On the first day of the hearing, a dispute arose as to whether the Government was required to produce for Defendant's examination certain grand jury testimony. After the Court resolved the issue (Mem. Op. & Order, Feb. 26, 2007, R. at 35), the hearing on Defendant's motion continued on March 28, 2007. The hearing concluded the following day. Both parties submitted post-hearing briefs on May 10, 2007, (R. at 41, 42) and reply memoranda were timely filed shortly thereafter. (R. at 43, 44). These briefs raised issues not addressed at the evidentiary hearing, and in an Order dated August 27, 2007 the Court ordered additional briefing from the parties. (R. at 47). The parties have filed their briefs and responses (R. at 48, 49, 53) and these issues are now ripe for adjudication. For the reasons set forth below, the Court **GRANTS** Defendant's motion.

## I.    Factual Background

An investigation conducted by a FBI cyber crime task force discovered that a person using the user name "Poi" had posted numerous links and instructions on the website of the North American Man/Girl Love Association ("NAMGLA") that enabled other users to download child pornography from various locations on the Internet.  Investigators determined that the Internet protocol ("IP") address of the person posting as Poi was registered in Defendant's name.  Further, telephone records revealed that the phone number utilized to access the Internet through this IP address was listed in Defendant's name at 234 W. Athens Rd., Roseville, Ohio ("the Roseville property").  With this information, FBI Special Agent Robert White ("S.A. White"), an agent on the cyber crime task force, obtained a search warrant for the Roseville property.[1]

On the morning of July 25, 2006, a team of law enforcement officers convened at the Roseville police department to make preparations for executing the search warrant.  The team consisted of officers from the Perry County Sheriff's Department, officers of the Roseville Police Department, task force officers ("T.F.O.s") from the FBI cyber crime task force, and other FBI agents.  The team reviewed the search warrant and how it was to be executed.  They also discussed other parcels of property they believed Defendant owned.  Approximately one week earlier, using real estate records and an Ohio law enforcement database, the FBI task force had learned that

---

[1] On the search warrant, the address of the property to be searched was typewritten as "234 W. Athens Rd, Roseville Ohio 32777 and detached garage," but there is a line striking "32777."  "43777 " and "tpk" appear handwritten immediately below and to the right of "32777."  (Gov't's Ex. 2.)  At the hearing, S.A. White explained that when preparing the search warrant and the application for the warrant, he had typewritten the wrong zip code.  The magistrate judge noticed the error on the search warrant, corrected it, and inscribed his initials.  S.A. White corrected the mistake on the application for the search warrant in identical fashion.  (Gov't's Ex. 9.)

Defendant owned property at 4171 Pike Township Road 223 SE, New Lexington, Ohio 43764 ("the New Lexington property").  During the meeting at the Roseville Police Department on the morning of July 25, the team also connected Defendant's name to a third property in the vicinity using water records.  After the meeting concluded, S.A. White led the team of law enforcement officers to execute the warrant at the Roseville address.

The officers executed the warrant just before 10:00 a.m., but the property was found vacant. S.A. White then walked to a nearby automobile repair shop to borrow a telephone to determine whether the phone line at the Roseville property was active.  While there, he spoke with shop workers and customers who said they were familiar with Defendant.  From these conversations, S.A. White learned that Defendant came and went from the Roseville property to "fix up the place" but that the family did not live there.  (Suppression Hr'g Tr. p. 11., R. at 31).  The shop workers and customers told S.A. White that Defendant had been at the Roseville property earlier that day, but the task force had just missed him.  S.A. White returned to the Roseville property and left his business card and a copy of the search warrant on the kitchen counter.

After the team found the Roseville property vacant, S.A. White decided to attempt to locate Defendant. He split the search warrant execution team into two smaller teams.  One team proceeded to the New Lexington property.  The other team was sent to the second alternative address thought to be owned by Defendant.[2]

The team en route to the New Lexington property consisted of S.A. White, Task Force Officer Darren Smith ("T.F.O. Smith"), Task Force Officer Evan Pridham ("T.F.O. Pridham"), FBI

---

[2] The task force later determined that the second alternative address was not related to Defendant.

Agent Charles Seymour, FBI Agent Ben Gessford, "and at least one unit from the sheriff's department."[3]  (Id. at 12.)  The team traveled in four cars.

The team stopped at the top of a hill about a half mile from the New Lexington property because the local law enforcement officers informed them that they were about to enter an area without cell phone service.  S.A. White used his cell phone to call Assistant U.S. Attorney Douglas Squires ("A.U.S.A. Squires"), and he informed A.U.S.A. Squires that he thought he had probable cause to believe that Defendant and the computer used by Poi were located at the New Lexington property.  A.U.S.A. Squires then connected Magistrate Judge Kemp, who had issued the search warrant for the Roseville property, for a telephone conversation for the purpose of obtaining a telephonic search warrant for the New Lexington property. (Id. at 18-19).  S.A. White testified that he related his probable cause as to the New Lexington property, and Magistrate Judge Kemp began detailing the procedures necessary to obtain a telephonic search warrant.  (Id. at 18.)

The events that transpired thereafter are disputed.  S.A. White testified that while speaking with A.U.S.A. Squires and Magistrate Judge Kemp, he sent T.F.O.s Pridham and Smith to obtain a description of the New Lexington property, which he needed to complete the application for the new search warrant.  S.A. White testified that the two task force officers left in a single vehicle unaccompanied by any of the other officers.  Shortly thereafter, T.F.O.s Pridham and Smith reported

---

[3] S.A. White testified that the team sent to the second alternative address included Task Force Officer Brian Marvin ("T.F.O. Marvin"), Task Force Officer Joe Singleton, and a group of two to four uniformed officers from the Roseville Police Department and the Perry County Sheriff's Department.  S.A. White's testimony is partially contradicted by a "Supplemental Investigation Report" submitted by T.F.O. Smith on July 25, 2006.  (Def.'s Ex. H.)  In his report, T.F.O. Smith states that T.F.O. Marvin was part of the team that proceeded to the New Lexington property, not the team that was sent to the second alternative address.  When presented with this discrepancy at the hearing, S.A. White said that T.F.O. Smith's account was incorrect.

back to S.A. White, either by cell phone or radio, that they had engaged Defendant in the front yard of the New Lexington property and that he would consent to a search of his home. At that point, S.A. White terminated his conversation with A.U.S.A. Squires and Magistrate Judge Kemp without obtaining the telephonic search warrant. (Id. at 76-77). The rest of the caravan that had stopped at the top of the hill then proceeded to the New Lexington property.[4]

When S.A. White arrived at the New Lexington property, Defendant was at the end of the property talking to T.F.O.s Smith and Pridham. S.A. White approached Defendant and greeted him at the end of the driveway. He introduced himself, told Defendant he was in charge of the team of law enforcement officers, and informed Defendant that they had just executed a search warrant at the Roseville property. He then asked Defendant for consent to search the New Lexington property.[5]

According to S.A. White, Defendant said he would consent to the search of the New Lexington property, and he asked for a copy of the search warrant for the Roseville property. S.A. White went to his car to get a copy of the search warrant for the Roseville property, and he returned and handed it to Defendant. S.A. White left this copy of the search warrant with Defendant. S.A. White testified that Defendant was "very calm" and "pleasant" during this exchange.[6] (Id. at 25.)

After Defendant verbally consented to the search, S.A. White again went to his vehicle, this time to retrieve consent to search forms and a notebook. (Id. at 28.) By the time he returned,

---

[4] The other team was still investigating the second alternative address.

[5] S.A. White testified that he was dressed casually and his firearm was visible but holstered. The Roseville Police Department officers and the Perry County Sheriff's Department officers were dressed in uniform. The other law enforcement officers were dressed similarly to S.A. White.

[6] S.A. White did not indicate whether T.F.O. Smith or T.F.O. Pridham were close enough to overhear the conversation between Defendant and him. For his part, Defendant testified that no one was standing next to him and S.A. White as they talked.

Defendant had walked to his Ford F-150 truck, parked in the carport, where T.F.O. Pridham was standing. Standing beside the truck, S.A. White presented two form documents to Defendant, one titled "CONSENT TO SEARCH" and the other titled "Consent To Assume Online Presence." S.A.White explained the forms to Defendant and read the consent to search form to him. This form had a blank area for itemizing things and areas to be searched, stated that consent was being freely and voluntarily given, and had spaces for the subject of the search and a witness to sign. Defendant did not ask any questions regarding the forms.

S.A. White testified that Defendant seemed concerned when the team approached the truck. When asked why he was concerned, Defendant informed the team that his laptop computer was in the truck and that he had been using the laptop computer to access child pornography from the Roseville property. S.A. White began to complete the consent to search form as he and Defendant talked. He first listed on the form the address of the New Lexington property. Defendant then signed the form on the signature line indicated, and S.A. White signed the form as a witness.[7] At that point, S.A. White switched from the black ink pen that he had been using to a blue ink pen because either he had misplaced the black ink pen or it had run out of ink. S.A. White then added the descriptions of Defendant's Dodge minivan, which was also parked at the New Lexington property; the Ford F-150 truck; "and the computers herein" to the places to be searched. (Gov't's Ex. 3.). The descriptions of the two vehicles included their respective license plate numbers and vehicle identification numbers ("VIN"). S.A. White testified that Defendant assisted him with obtaining the VIN for the Ford truck. Once the vehicle descriptions had been added to the form,

---

[7] The form was completed on the day of the search, July 25, 2006, but S.A. White incorrectly dated the form July 28, 2006.

Defendant inscribed his initials next to the description of each vehicle and the address of the New Lexington property. Immediately thereafter, S.A. White and Defendant completed the "Consent To Assume Online Presence" form. This form gave the FBI permission to take over Defendant's "online presence" on Internet sites related to child pornography so agents could discover other offenders. Defendant filled in the spaces on the form calling for his online accounts, screen names, and passwords, and he signed and dated the form at the bottom.

According to S.A. White, Defendant gave verbal consent for the team to search "maybe 15 seconds, 30 seconds" after S.A. White arrived at the New Lexington property. (Suppression Hr'g Tr. p. 39, R. at 31). Defendant signed the consent to search form approximately two minutes after S.A. White first engaged Defendant. At no time did S.A. White draw his firearm, and he did not threaten Defendant in any way.[8] S.A. White testified that the search of the house and vehicles on the New Lexington property did not begin until after the consent to search form was completed and signed. (Id. at 32.). The search lasted approximately one to one and one-half hours. Investigators discovered and seized a laptop computer from Defendant's Ford truck and a desktop computer from the main bedroom of the house. Using forensic software, S.A. White later discovered files on the hard drives of these computers containing over 8,000 pornographic images of children. (Compl. 4, R. at 1.).

Defendant provided a vastly different description of the events of July 25, 2006. He testified that he was mowing the grass in his front yard when two unmarked cars pulled into his driveway. T.F.O. Pridham was driving the first car and Sgt. Drake of the Perry County Sheriff's Office was the passenger. According to Defendant, there were either two or three officers in the second car,

---

[8] Defendant similarly testified that he was not physically threatened by S.A. White.

including T.F.O. Smith.  Defendant testified that he turned off the lawnmower and went to see what the officers wanted.

T.F.O. Pridham approached Defendant, identified himself, and displayed identification. T.F.O. Pridham's firearm was visible but holstered.  Before Defendant began to talk to T.F.O. Pridham, two marked cars from the Perry County Sheriff's Office arrived with one officer in the first car and two deputies in the second car.  T.F.O. Pridham then asked Defendant about his computer skills and whether he owned a laptop computer.  Defendant replied that he did not own a laptop.[9] He also told T.F.O. Pridham that he was a computer "ditz" and that on a scale of one to ten he rated his computing skills a three.  (Suppression Hr'g Tr. p. 142-43, R. at 40).  According to Defendant, T.F.O. Pridham did not tell Defendant why the officers were there, did not inform him that the team of law enforcement officers had just searched the Roseville property, and did not ask for his consent to search the New Lexington property.  T.F.O. Pridham then left Defendant to go talk to some of the other officers.  He returned a few moments later and told Defendant that someone else wanted to talk to him.  Shortly thereafter, another two unmarked cars arrived.  Defendant testified that in one of the cars there were four law enforcement officers in plain clothes.  S.A. White was alone in the other car.

Defendant's testimony regarding his initial encounter with S.A. White contradicts S.A. White's testimony in several ways.  According to Defendant, when S.A. White got out of his car and approached him, he was holding some papers attached to a clipboard or notebook of some sort. Defendant testified that the address of the Roseville property appeared typewritten on the document

---

[9] Defendant testified at the hearing that this answer was not truthful and that he lied because he was scared.

in S.A. White's hand, but there were lines through the Roseville property's address and the address of the New Lexington property had been added as a handwritten interlineation. As he pointed to the New Lexington property's address with his pen, S.A. White told Defendant that "they had a warrant to search [his] house but that they would like to get [his] consent first." (Id. at 149). S.A. White did not give Defendant a copy of the warrant presented; he kept it in his hand as he was displaying it to Defendant. Defendant denied that S.A. White informed him of the search warrant being executed at the Roseville property. Instead, he testified that he did not learn of the search at the Roseville property until he later went there and discovered the copy of the search warrant on the kitchen counter. Defendant kept this copy.

Defendant admitted that he signed the written consent to search form. Furthermore, although he denied reading the form and denied that S.A. White read or otherwise explained the form to him, Defendant testified that when he signed the form he knew he had the right to not consent. According to Defendant, S.A. White did not explain what would happen if he did not consent to the search of his home and vehicles. Nevertheless, Defendant understood, at the time, that because they had a search warrant, the officers were going to search the New Lexington property regardless of whether he consented. Defendant testified that he consented to the search because he "knew that they would do it anyway." (Id. at 177). Defendant had other reasons for consenting as well. He believed that if they searched without his consent, the police would tear up his home similar to how he had seen police officers conduct searches on television shows. Defendant felt that, by consenting to the search, the team of investigators would "go easier on [him]." (Id. at 152). He testified that he had friends from out of town coming to visit that day, and he wanted the search to be completed before

they arrived. Defendant did not discuss his fear of the police tearing up his house with S.A. White, nor did he inform S.A. White of his concern about his friends arriving that day.[10]

## II.     Defendant's Motion to Suppress

Defendant argues that his right to be free from unreasonable searches and seizures pursuant to the Fourth Amendment to the United States Constitution was violated when the Government searched his home and vehicles without a valid search warrant and without his voluntary consent. (Def. Mot. Suppress, R. at 22). Defendant moves this Court to suppress all evidence obtained from his home and vehicles on July 25, 2006 and all other evidence considered "fruit of the poisonous tree" obtained as a result of the July 25, 2006 search and seizure. (Id.). The Government, in addition to arguing that Defendant gave voluntary consent (Gov't. Mem. in Opp'n, R. at 23), also argues that the search of Defendant's automobile was permissible under the automobile exception to the Fourth Amendment (Gov't. Reply to Def.'s Post-Hr'g Br., R. at 44), and that the entire search was permissible under the inevitable discovery doctrine. (Gov't. Post-Hr'g Br. Opp'n, R. at 41). The Court will address these arguments in turn.

### A.     General Standard for a Motion to Suppress

Searches and seizures conducted without warrants issued by a judge or magistrate are per se unreasonable under the Fourth Amendment unless a specifically established exception applies. Katz v. United States, 389 U.S. 347, 357 (1967). When searches are conducted without the authority

---

[10] Defendant's testimony contradicted S.A. White's testimony in one other aspect. S.A. White testified that he and Defendant completed the "Consent To Assume Online Presence" form immediately after the consent to search form was finished. To the contrary, Defendant testified that the second form was not completed until after the search had taken place and three agents discussed that form with him.

of a search warrant, the Government has the burden of showing that an exception applies to the warrant requirement. Vale v. Louisiana, 399 U.S. 30, 34 (1970).

Generally, evidence obtained in violation of the Fourth Amendment is inadmissible at trial. See Mapp v. Ohio, 367 U.S. 643, 648 (1967). However, this exclusionary rule is not derived from the Fourth Amendment itself. It is a judicially created remedy designed to deter unreasonable searches and seizures. United States v. Leon, 468 U.S. 897, 906-07 (1984). For this reason, it is improper to apply the exclusionary rule when doing so will not deter future unreasonable searches and seizures. See id. at 907-08; see also Hudson v. Michigan, – U.S. –, –, 126 S. Ct. 2159, 2165-70 (2006); Illinois v. Krull, 480 U.S. 340, 353 (1987).

In addition to evidence obtained directly as a result of an illegal search, evidence acquired as a consequence of an illegal search is inadmissible under the fruit of the poisonous tree doctrine. Wong Sun v. United States, 371 U.S. 471, 484-86 (1963). Under this doctrine, verbal and physical evidence derived from an unlawful search or seizure is inadmissible at trial. Id. at 485-86.

When determining whether to grant a defendant's motion to suppress, district courts are often confronted with factual disputes. See United States v. Matlock, 415 U.S. 164, 173-75 (1974); United States v. Brown, 20 F. App'x 387, 388-89 (6th Cir. Sept. 21, 2001) (unpublished) (citing United States v. Bradshaw, 102 F.3d 204, 209-10 (6th Cir. 1996)). In resolving factual discrepancies, the court must judge the credibility of witnesses and weigh the evidence presented. Brown, 20 F. App'x at 388-89 (citing Bradshaw, 102 F.3d at 209-10).

**B.    Search Pursuant to Voluntary Consent**

The Government concedes that the search of the house and vehicles at the New Lexington property was conducted without a valid search warrant. It maintains, however, that Defendant freely

and voluntarily consented to the search.  (Gov't. Mem. Opp'n, R. at 23).  Defendant disagrees, arguing that the task force did not obtain his freely given and voluntary consent before the search of his home and vehicles commenced.  (Def. Mot. Suppress, R. at 22).

## 1.    Legal Standard for Determining Voluntary Consent

A search conducted with the voluntary consent of the person holding a reasonable expectation of privacy in the area searched is reasonable, and it therefore does not violate the Fourth Amendment.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  The Government has the burden to prove the existence of voluntary consent by a preponderance of the evidence.  White Fabricating Co. v. United States, 903 F.2d 404, 408 (6th Cir. 1990).  Additionally, "[c]onsent must be proved by clear and positive testimony."  United States v. Tillman, 963 F.2d 137, 143 (6th Cir. 1992).  The Government does not need to show that the defendant subjectively believed he was voluntarily consenting.  See Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990).  Rather, it is sufficient to show that police had a reasonable belief that voluntary consent had been given.  Id.

Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion."  United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977).  Whether consent is given freely is a question of fact to be determined by the Court, not the jury, by evaluating the totality of the circumstances.  Schneckloth, 412 U.S. at 227.  Relevant factors a court should consider when determining whether consent was voluntary include: (1) the age, intelligence, and education of the person consenting; (2) whether the person understands the right to refuse consent; (3) whether the person is advised of his or her constitutional rights; (4) the length and nature of any detention of the person coincident to the consent; (5) whether there is repeated and prolonged questioning or requests for consent; (6) the existence of any coercive or punishing

12

conduct by police; and (7) whether there are indications of subtle coercion that may overcome a person's judgment. United States v. Ivy, 165 F.3d 397, 402 (6th Cir. 1998); see also United States v. Jones, 846 F.2d 358, 360 (6th Cir. 1988) (citing Schneckloth). Any list of factors merely provides guidance, however; whether voluntary consent exists in a given case must be decided upon its own unique set of facts.

Consent cannot be obtained by force or by an implied threat of force. See Schneckloth, 412 U.S. at 228. However, there is no requirement that the defendant know that he has a right to refuse consent. Id. at 227. The familiar standard from Johnson v. Zerbst, 304 U.S. 458, 464 (1938), that waiver requires "an intentional relinquishment or abandonment of a known right or privilege," is limited to use in the context of waiving rights associated with a fair trial; it does not apply to persons asserting Fourth Amendment rights. Schneckloth, 412 U.S. at 235-46. Instead, the focus is solely on the voluntariness of the consent given. Whether the defendant was advised of his right to refuse consent is one of many factors to consider in determining the voluntariness of the consent. Id. at 225-27.

Consent is not necessarily involuntary in the situation where a police officer notifies the defendant that he does not have a valid search warrant but will obtain one if the defendant does not consent. Ivy, 165 F.3d at 403. In that situation, the officer is not coercing consent to search;[11] he is lawfully informing the defendant of a course of action available to the police. See id. Conversely, consent is not voluntary when it is given only after the law enforcement official conducting the search asserts that he possesses a search warrant. Bumper v. North Carolina, 391 U.S. 543, 548-50

---

[11] The police officer's action would be coercive if he or she knew that probable cause to support the issuance of a warrant did not exist. See United States v. Salvo, 133 F.3d 943, 954 (6th Cir. 1998) (quoting United States v. Kaplan, 895 F.2d 618, 622 (9th Cir. 1990)).

(1968).  In <u>Bumper</u>, four law enforcement officers investigating an alleged rape went to the home where the petitioner lived with his grandmother, Hattie Leath.  <u>Id.</u> at 546.

> She met the officers at the front door.  One of them announced, "I have a search warrant to search your house."  Mrs. Leath responded, "Go ahead," and opened the door.  In the kitchen the officers found the rifle that was later introduced in evidence at petitioner's trial after a motion to suppress had been denied.

<u>Id.</u>  The Supreme Court held that under these circumstances the government could not meet its burden of showing that consent for the search had been granted.  <u>Id.</u> at 548.  It described the situation where a law enforcement officer falsely claims authority to search a home pursuant to a warrant as "instinct with coercion" because the officer declares, in effect, "that the occupant has no right to resist the search."  <u>Id.</u> at 550.  Submission to the presentation of a search warrant is not the equivalent to consenting to the search; it is a "submission to the law."  <u>Id.</u> at 549 n.14.  It cannot be said that a person consents to a search when a law enforcement officer represents that the search will occur against the person's will if necessary.  <u>Id.</u>  Accordingly, the Government's "burden cannot be discharged by showing no more than acquiescence to claim of lawful authority."  <u>Id.</u> at 548-49.

### 2.    Analysis

In the present case, there is no doubt as to whether Defendant gave consent to the search of his home and vehicles at the New Lexington property.  Defendant testified that he signed the consent to search form, which unambiguously authorized the task force to conduct a complete search of the house and vehicles and to seize any property determined to be related to their investigation.  (Suppression Hr'g Tr. p. 150, R. at 31).  The question is whether Defendant gave his consent freely.

According to the Government, Defendant consented to a search of his property at some point during his first contact with law enforcement – a contention strongly denied by Defendant.  S.A.

White testified that he sent T.F.O. Smith and T.F.O. Pridham to the New Lexington property for the purpose of obtaining a description of the property in order to obtain a search warrant for that property. When they arrived they found Defendant outside his house, mowing the grass. According to Defendant, though, two unmarked cars pulled into his driveway, with T.F.O. Pridham driving the first car and Sgt. Drake of the Perry County Sheriff's Office in the passenger seat. T.F.O. Smith was in the second car with one or two other officers. Defendant testified that he turned off the mower and went to see what the officers wanted.

It is obvious that two extremely important witnesses in this case were T.F.O. Pridham and T.F.O. Smith, but they were not called. According to S.A. White, T.F.O. Pridham and T.F.O. Smith called S.A. White either by cell phone or radio – S.A. White could not recall how the call came to him – and told S.A. White that Defendant would consent to a search of his home. In resolving the conflict between S.A. White's recollection of what he was told by T.F.O. Pridham or T.F.O. Smith, or both – this is not clear – and Defendant's testimony of his conversation with T.F.O. Pridham, several factors must be considered.

First, it is undisputed that T.F.O. Pridham did <u>not</u> inform Defendant of the reason law enforcement officers were gathered at his house, i.e., for the sole purpose of obtaining a description of the property in order to obtain a search warrant. Second, as opposed to a hearsay statement from T.F.O. Smith or T.F.O. Pridham, or both, by way of either a radio transmission or a cell phone call (a cell phone call coming from a geographical area where no cell phone transmissions were possible (<u>Id.</u> p. 13)), the Court has the personal testimony of Defendant, who described in great detail his conversation with T.F.O. Pridham. Third, Defendant's testimony regarding his conversation with T.F.O. Pridham included statements he made to T.F.O. Pridham which Defendant confessed were

untrue, but which lend credence to Defendant's version of that conversation.  Fourth, Defendant's demeanor while testifying to his first encounter with T.F.O. Pridham and the other law enforcement officers was convincing, and indicated that Defendant's version was more truthful.  The Court, therefore, finds that Defendant did not give to T.F.O. Pridham, T.F.O. Smith, or any of the other officers gathered at the New Lexington property prior to the arrival of S.A. White any consent to search his property or his vehicles.

The oral consent to search the New Lexington property that Defendant gave to S.A. White involves a conflict between Defendant's testimony and S.A. White's testimony.  It should be noted at the outset, however, that the Court, having heard that testimony and having observed the demeanor of these two key witnesses, is convinced that neither witnesses has intentionally given false testimony.  Memories fade with the passage of time, and the fact that there can be some inconsistencies in the testimonies of Defendant and S.A. White is not surprising.  Failure to recall a minor, insignificant event is of little or no importance.  Failure to recall a critically important event, on the other hand, even when truthfully stated, can be of major significance in the context of all the evidence.

The critically important event in this case involves the search warrant issued for the Roseville property.  It is undisputed, of course, that S.A. White had no valid warrant to search the New Lexington property.  He was in the process of trying to obtain such a warrant when he learned that T.F.O. Pridham and T.F.O. Smith were engaged in personal contact with Defendant himself, at which point S.A. White abandoned his efforts with Magistrate Judge Kemp and A.U.S.A. Squires to obtain a valid warrant and proceeded down the hill to the New Lexington property.  According to S.A. White, he approached Defendant and told him that the officers had just come from executing

16

a search warrant at the Roseville property, and that they would like to search Defendant's New Lexington property. (Id. p. 39, 91). When Defendant asked S.A. White to see the search warrant for the Roseville property, S.A. White went to his car to get a copy of the search warrant, returned, and handed it to Defendant. It is at this exact point that the critical issue arises. Defendant testified that when S.A. White approached him he pointed to a document that bore the typewritten address of the Roseville property, which had been changed by a handwritten interlineation to the address of the New Lexington property, and then S.A. White said that "they had a warrant to search [his] house but that they would like to get [his] consent first." (Id. p. 149). The Court, then, is faced with the need to reconcile, if possible, the conflicting testimony while acknowledging that both witnesses were forthright and credible in their respective recollections of this important event. Several factors stand out.

First, it is undisputed that S.A. White told Defendant that they had just come from a search of the Roseville property and wanted to search the New Lexington property. Second, it is undisputed that Defendant was shown a search warrant, either an unaltered copy of the warrant for the Roseville property or a copy of that warrant with the address of the Roseville property changed by handwritten interlineation to the address of the New Lexington property. Third, Defendant testified positively that he in fact saw the altered address on the purported search warrant shown by S.A. White. Fourth, S.A. White, in response, simply could not recall whether he added any interlineation to the search warrant. Fifth, it is understandable that a copy of the warrant for the Roseville property could have had the address of the New Lexington property interlineated on it. S.A. White and his officers were discussing the process of obtaining a telephonic search warrant from Magistrate Judge Kemp, a warrant that would have a new address and a new description of the

17

subject property. They had the former and were discussing the latter when S.A. White received the call from either T.F.O. Smith or T.F.O Pridham. It is not unreasonable, considering the circumstances at that time, that in the process of talking to Magistrate Judge Kemp and A.U.S.A. Squires, the warrant for the Roseville property was used as the basis for the new warrant and the interlineation made without any intention to use it improperly.

The Court concludes that, based on Defendant's positive testimony, which the Court finds credible, and S.A. White's inability to specifically contradict that testimony, Defendant was presented with a copy of the warrant for the Roseville property which bore, by interlineation, the address of the New Lexington property. Defendant's consent, after being shown an invalid search warrant for the New Lexington property, was not a valid consent.

Having reached this conclusion regarding the disputed testimony over the altered address on the warrant for the Roseville property, the Court points out that the result would be the same even if the Roseville warrant had not been altered. According to the Government's own evidence, Defendant asked to see a copy of the Roseville warrant, and he was given a copy. We thus have this alternative situation:

Defendant, surrounded by law enforcement officers, some in uniform and in marked cars, was told that they had just come from his Roseville property after searching that property pursuant to a search warrant, was given a copy of that search warrant, and was asked to give consent to the search of the New Lexington property. The Court believes that a layman, not versed in Fourth Amendment law dealing with search warrants, would reasonably assume that under these circumstances the officers already had the authority to search his property, making any objection to the search futile. This is exactly the position Defendant found himself in. He understood that

18

because the officers had a search warrant, they were going to search the New Lexington property regardless of whether he consented or not. He consented to the search because "he knew that they would do it anyway." (Id. p. 177).

This case is similar to Bumper, but here the officers did not deliberately make any false representation that they had a warrant for the New Lexington property. They did, however, clearly lead Defendant to believe – reasonably – that they did possess a search warrant for the Roseville property. He asked them for a copy of this warrant and was given a copy, but with no explanation that the warrant did not authorize a search of his New Lexington property. The Court concludes, based upon the totality of the circumstances, that the consent to search thereafter given by Defendant was not voluntary. Thus, the warrantless search of Defendant's property was unreasonable and violated the Fourth Amendment.

### C.    Search Pursuant to the Automobile Exception

Next, the Government argues that the laptop recovered from Defendant's automobile is admissible, even absent consent, under the automobile exception to the Fourth Amendment's warrant requirement because the agents had probable cause to search the automobile. (Gov't.'s Reply to Def.'s Post-Hr'g Br., R. at 44). Defendant counters by arguing that the automobile exception does not apply because the agents did not have probable cause to search the automobile, and because the automobile was parked on Defendant's private residence and was not subject to the automobile exception in the first place. (Def.'s Reply, R. at 46).

### 1.    Legal Standard for Applying the Automobile Exception

### a.    The Automobile Exception

The "automobile exception" to the Fourth Amendment's warrant requirement was first recognized by the Supreme Court in 1925 in Carroll v. United States, 267 U.S. 132. There, the Court stated that, while individuals do have a constitutionally protected privacy interest in their automobile, an automobile's ready mobility and capacity to be "quickly moved out of the locality or jurisdiction in which [a] warrant must be sought" justified a reduced degree of protection of those privacy interests. Id. at 153. The Supreme Court has consistently reaffirmed this justification for the automobile exception. See California v. Carney, 471 U.S. 386, 390 (1985) (collecting cases)).

"However, although ready mobility alone was perhaps the original justification for the vehicle exception . . . later cases have made clear that ready mobility is not the only basis for the exception." Id. at 391. "Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." South Dakota v. Opperman, 428 U.S. 364, 367 (1976). This reduced expectation of privacy is due to the "pervasive regulation of vehicles capable of traveling on public highways." Carney, 471 U.S. at 392 (citing Cady v. Dombrowski, 413 U.S. 433, 440-41 (1973).

The Supreme Court has made it clear that the automobile exception contains no separate exigency requirement. Maryland v. Dyson, 527 U.S. 465, 467 (1999) (citing United States v. Ross, 456 U.S. 798 (1982)). Rather, the police need only probable cause that evidence of a crime is located inside an automobile to validly search that automobile without a warrant under the automobile exception. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (see also Dyson, 527 U.S. at 467).

The automobile exception has its limits, of course.  "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears."  Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971).  "Although probable cause suffices for the search or seizure of vehicles parked on public property (or even private property that is accessible to the public), no Supreme Court decision allows warrantless entry into areas of a home or business where the owner has a reasonable expectation of privacy simply because the police are in search of an automobile." Binder v. Redford Tp. Police Dept., 93 F. App'x. 701, 703 (6th Cir. Feb. 27, 2004).  Thus, a Court must first resolve the issue of whether the individual challenging the search had a legitimate expectation of privacy in the area where the automobile is located before determining if the automobile exception applies.  See, e.g., United States v. Manning, No. 06-10, 2007 WL 1656223, *7-8 (M.D. Tenn. June 7, 2007) (discussing whether automobile searched was within curtilage before discussing probable cause); United States v. O'Connell, 408 F. Supp. 2d 712, 719 (N.D. Iowa 2005) (same).

### b. Curtilage

It is well established that the Fourth Amendment's protection of an individual's home extends to the home's curtilage.  Oliver v. United States, 466 U.S. 170, 180 (1984).  The curtilage is the area that is intimately linked to the home and within which the intimate activities associated with the home occur.  Id., see also California v. Ciraolo, 476 U.S. 207, 212-13 (1986) ("the protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically").  How to define and delineate  "curtilage," however, evades precise definition.  United States v. Jenkins, 124 F.3d 768, 772 (6th Cir. 1997).

21

The Supreme Court has stated that the boundaries of a home's curtilage are defined by reference to facts indicating "whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." Oliver, 466 U.S. at 180. In United States v. Dunn, 480 U.S. 294 (1987), the Supreme Court set forth four factors to consider in defining the extent of a home's curtilage: 1) the proximity to the home; 2) whether the area is within an enclosure surrounding the home; 3) the purpose for which the area is used; and 4) the steps taken to protect the area from public view. Id. at 301. The Court warned, however, that the above factors were not to be used as a rigid test. Id., see also Jenkins, 124 F.3d at 772. Instead, a court should use these factors as "analytical tools" in deciding "the centrally relevant consideration - whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301. When applying the Dunn factors a court must remember that "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." Daughenbaugh v. City of Tiffin, 150 F.3d 594, 598 (6th Cir. 1998). The Defendant bears "the burden of showing that: (1) he manifested a subjective expectation of privacy in the area searched; and (2) his expectation of privacy is objectively reasonable." United States v. Rigsby, 943 F.2d 631, 636 (6th Cir. 1991). That is, the Defendant bears the burden of showing that his truck was within his home's curtilage.

## 2.    Analysis

Before determining whether Defendant's truck was within his home's curtilage, a thorough explanation of the physical layout of Defendant's property is in order.

Defendant's property has frontage on the north side of Township Road 223 in Perry County. (Gov't. Mem. Re: Search within Curtilage, R. at 49). Defendant's property consists of several acres

of flat land surrounded by woods, on which are a house and garage with attached carport.[12]  (Id. ex.

2A, R. at 50).  A four foot high mesh wire fence encircles Defendant's property, with a metal gate

at approximately the midpoint of the property's frontage on the road.  (Id.; Def. Post-Hr'g Mem. in

Resp, R. at 48).  This gate, which was open on the day of the search, leads to a gravel driveway

running perpendicular to the road.  (Id.).  At the end of the driveway on the left is Defendant's

house, while on the right and slightly closer to the road is the garage/carport.  (Gov't. Mem. Re:

Search within Curtilage ex. 2A, R. at 50).  The parties do not agree on the exact location of and

spacial relationship between the house and garage/carport.  Defendant asserts that the carport is

between 20 and 30 feet from the house, (Def. Post-Hr'g Mem. in Resp. p. 3, R. at 48), while the

Government asserts that the carport is no less than 60 feet from the house.  (Gov't. Mem. Re: Search

within Curtilage p. 5, R. at 49).  Furthermore, Defendant at times asserts that the carport is set back

from the road by between 70 and 80 feet, (Def. Post-Hr'g Mem. in Resp. p. 2, R. at 48), and at other

times asserts that it sat only 30 to 40 feet away from the road.  (Id. p. 4).  The Government simply

asserts that it is less than 60 feet from the road.  (Gov't. Mem. Re: Search within Curtilage p. 5, R.

at 49).  It is not necessary to resolve these discrepancies, and the Court makes no effort to do so.

The house and garage/carport are isolated from the road and driveway by an interior fence

that runs along the left side of the gravel driveway from the gate, makes a 90 degree right turn at the

end of the driveway, and stops at the midpoint of the garage/carport's left end.  (Id.).  The

garage/carport consists of an enclosed garage on the left of the structure, and a covered two-bay

carport attached to the garage on the right.  Although the roof of the carport is slightly lower than

---

[12] Defendant also has a large barn on the extreme eastern end of his property.  (Gov't.
Mem Re: Search within Curtilage ex. 2A, R. at 50).  However, the location and description of the
barn are not relevant to this case.

the roof of the garage, the carport and garage are clearly one structure. (Id. ex. 11, 11A, 13, 13A, 14, R. at 52). The garage has a garage door slightly to the right of its midpoint and facing the road, and a sliding metal door immediately to the right of the garage door, also facing the road. (Id. ex. 13). Additionally, the garage has a door on its left end, on the same side of the interior fence as Defendant's house and facing the house, that grants access to the garage's interior from the home. (Def. Post-Hr'g Mem. in Resp. ex. 2, R. at 48; Gov't. Mem. Re: Search within Curtilage ex. 10, R. at 49). The carport is supported by wooden poles and is divided into two bays by a series of smaller poles and the continued interior fence, which begins again at the back of the enclosed garage, runs along the back of the first bay next to the garage and then down the middle of the bays, across the front of the second bay and up the right hand side of the second bay until the end of that bay, then off to the right to the eastern end of the property. (Gov't. Mem. Re: Search within Curtilage ex. 9, 11, 11A, 13A, 14, R. at 52). Thus, the entrance to the first bay is not fenced and permits an automobile to enter from the gravel driveway. Persons in the automobile then obtain access to the home by opening the sliding door in the garage and then exiting the door from the garage to the home. The second bay is completely contained within the interior fence. Additionally, there is a basketball hoop adjacent to the carport (Id. ex. 13A, R. at 52).

The parties differ slightly as to the location of Defendant's truck on the day of the search. Both parties agree that the truck was located in the first bay that was accessible from the driveway. While Defendant maintains that the truck was pulled in under the shelter of the carport, (Def. Post-Hr'g Mem. in Resp. p. 2, R. at 48; Suppression Hr'g Tr. p. 162-63, R. at 40), the Goverment argues that the truck was backed only partly into the first bay, not completely under it. (Gov't. Mem. Re: Search within Curtilage p. 5, R. at 49). S.A. White testified simply that Defendant's truck was in

24

what he called the detached garage, which is to say the carport. (Suppression Hr'g Tr. p. 29, R. at 31). The Court finds, based on Defendant's and S.A. White's testimony, that Defendant's truck was under the shelter of the carport when it was searched.

The Court now turns to an evaluation and application of the four Dunn factors, keeping in mind that the ultimate inquiry is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301. With respect to the first Dunn factor - proximity to the home - the Court notes that this factor is generally not dispositive because there is no fixed distance at which curtilage ends. See, e.g., id. at 295 (barn 180 feet from house not within curtilage, but cottage 375 feet from house is within curtilage); Daughenbaugh, 150 F.3d at 598-99 (distance of 50 to 60 feet not conclusive). Moreover, "the curtilage of a home in a rural area could extend farther than the curtilage of a home in an urban or suburban setting." United States v. Johnson, 256 F.3d 895, 902 (9th Cir. 2001). The proximity of the carport to the home must be considered in light of these principles.

The Court finds that the proximity of the carport to the house weighs in favor of finding that the carport is within the curtilage of Defendant's home. Whether the carport was 20 or 60 feet from the house, the property's overall layout supports the conclusion that the carport was in close proximity to Defendant's home. When viewed from above, it is clear that the house and the garage/carport are part of a central cluster of buildings on Defendant's property that is surrounded by more open grassy areas. (Gov't. Mem. Re: Search within Curtilage ex. 2A, R. at 50). Despite the Government's assertion that the carport was not accessible from the house (Id. p. 7, R. at 49), the Court finds the carport was easily accessible from the house via the doors in the garage. A distance of 60 feet from house to carport is not excessive, especially in a rural area. Additionally,

25

the existence of a remote barn on the eastern end of Defendant's property, separated from the house and garage/carport by a wide, empty field, illustrates the difference in proximity between the house and carport and the house and barn.  (Id. ex. 2A, R. at 50).  The Court finds that the first Dunn factor weighs in favor of finding that the carport is within the home's curtilage.

Turning to the second Dunn factor, the Court must consider whether the garage/carport is within an enclosure that also surrounds the house.  In Dunn the Supreme Court in part relied on the fact that the defendant's land was separated by internal fences, and stated that "[f]encing considerations are important factors in defining the curtilage," 480 U.S. at 301 n.4, because they "serve[] to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house."  Id. at 302.  See also Bleavins v. Bartels, 422 F.3d 445, 452 (7th Cir. 2005); United States v. Gerard, 362 F.3d 484, 488 (8th Cir. 2004); United States v. Breza, 308 F.3d 430, 436 (4th Cir. 2002).  Although it appears that the Sixth Circuit has not dealt with the issues presented by interior fencing, this Court finds persuasive a Ninth Circuit opinion stating that, in situations involving interior fencing, "[t]he proper focus of this factor is on whether interior fencing clearly demarcates the curtilage."  United States v. Traynor, 990 F.2d 1153, 1158 (9th Cir. 1993) (overruled on other grounds by United States v. Johnson, 256 F.3d 895 (9th Cir. 2001) (en banc)).

The Court finds that the enclosure factor, in this case, supports a finding that the carport is inside the home's curtilage.  It is true that the interior fencing does not completely surround the house, but the interior fencing is clearly designed to prevent public access to the homestead.  It blocks public access to the home, garage interior, and second carport from the gravel driveway.  While access to the first carport is not blocked, the first carport is clearly part of the curtilage

because the interior fence did not divide Defendant's home from the carport.  The garage had a door on its left side that was on the same side of the interior fence as Defendant's home, through which an individual could enter the garage from the home without crossing the interior fence.  (Gov't. Mem. Re: Search within Curtilage ex. 10, 12, R. at 52).  Furthermore, once inside the garage, an individual could then use the sliding metal door to access the carport.  (Id. ex 13).  The carport is clearly connected to the garage and thus is within the home's curtilage.  The interior fence, then, clearly demarcates the extent of the home's curtilage, and this factor supports a finding that the carport is within the home's curtilage.

The third Dunn factor requires the Court to evaluate the purpose for which the area was used. This factor most closely relates to the central inquiry of whether an area is within the curtilage of the home because it bears on the question of whether the area was used for or associated with the intimate activities of the home and domestic life.  See Daughenbaugh, 150 F.3d at 599 (noting that the Court in Dunn placed special emphasis on this factor in its analysis of whether the area was within the curtilage).  Where there is objective information that the area was not being used for such intimate activities, the third Dunn factor will weigh against a finding of curtilage.  See, e.g., Dunn, 480 U.S. at 302-3.  However, when considering whether officers had objective data that the area was not being used for intimate activities associated with the home, a court should only consider the objective information available to the officers before the officers entered the area at issue.  See, e.g., id.; Daughenbaugh, 150 F.3d at 599.  Thus, a court should consider how the area appeared to be used.  In addition, a court should consider whether the apparent use was of a type associated with the home.  See Dunn, 480 U.S. at 301-2; Jenkins, 124 F.3d at 773.

The Government is correct to point out that "there was no testimony on th[is] issue in this case," (Gov't. Mem. Re: Search within Curtilage p. 9, R. at 49), primarily because the Goverment only raised its automobile exception argument after the Court held the evidentiary hearing. Nevertheless, the record in this case is sufficient to allow the Court to determine that this factor weighs in favor of finding that the carport was used for a purpose associted with the intimate activites of the home.

Defendant used the carport to park his automobile, which is a domestic activity associated with one's home. This could be objectively verified before the officers entered the area. The majority of the "farm gear" that the Goverment asserts Defendant stored in the carport is located in the second bay, separated from the first bay by the internal fence, and does not support an inference that the first bay is not used for domestic activities. (Id. ex. 13A, R. at 52). Additionally, the area was clearly used for recreation. Defendant had placed a basketball hoop next to the carport, (id. ex. 13A, R. at 52), and Defendant asserts that the area "was regularly used by [Defendant's] children as an area to ride bikes and a general play area. The children's toys were often stored in the carport." (Def. Reply to Gov't Mem. p. 2, R. at 53). Officers could clearly observe the house, the garage/carport, and the basketball hoop upon their approach, and this objective fact supports the conclusion that Defendant's carport was used for activities commonly associated with intimate activites of domestic life.

Finally, the Court must consider the fourth Dunn factor, the steps taken to shield the area from view. This factor bears upon a defendant's expectation of privacy in a given area by both demonstrating this expectation, and by increasing the privacy of the area by preventing exposure to public view. See Jenkins, 124 F.3d at 772-73. A person's expectation of privacy in the areas

28

surrounding the home are compelling reasons to afford such areas the same Fourth Amendment protection as the home itself.  See id.  However, the Constitution does not "requir[e] a person to expend resources and sacrifice aesthetics by building a fence in order to obtain protection from unreasonable searches." Daughenbaugh, 150 F.3d at 599 (internal quotations and citations omitted). In addition to man-made efforts to shield an area from public view, such as fencing, a court may consider the natural barriers that inhibit easy viewing.  Id.  A court may also consider the fact that the home is located within a rural area, or the fact that it is set back from the road when evaluating this factor.  See Jenkins, 124 F.3d at 773 (noting the importance of the home's location within a rural area); Daughenbaugh, 150 F.3d at 600 (noting that the area at issue was set back from the road).

This factor weighs against a finding that the carport was part of the curtilage, but not conclusively so.  Although the bay was roofed, it clearly could be seen as a carport.  Whether the carport was set back from the road by 30 or 80 feet is immaterial, because the interior was clearly visible from the road.  (Def. Post-Hr'g Mem. in Resp. ex. 3, R. at 48; US. Mem. Re: Search within Curtilage ex. 3, R. at 51).  There are no natural barriers such as trees or high grasses that would inhibit a clear view into the carport bay.  (Id.).  The weight of this factor against Defendant is considerably mitigated, however, by the fact that Defendant lived in a rural area, and had no particular reason to believe it necessary to take steps to shield his property from view.  Jenkins, 124 F.3d at 773.

Evaluating all four Dunn factors together to answer "the centrally relevant consideration - whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection," Dunn, 480 U.S. at 301, the Court concludes that Defendant's carport is within his home's curtilage.  Defendant had a reasonable expectation of

29

privacy in his carport and, by placing his truck there, his truck was protected by the Fourth Amendment's warrant requirement.  The automobile exception does not apply in this case, and without a warrant the Goverment's search of Defendant's truck was unreasonable and all evidence recovered from the truck is subject to the exclusionary rule.

### D.    The Inevitable Discovery Doctrine

Finally, the Government argues that, even if Defendant's consent was not voluntary and the automobile exception does not apply, the inevitable discovery doctrine would permit the evidence obtained from Defendant's laptop and desktop computers to be admitted at trial.  The Government asserts that, had Defendant not consented, S.A. White would have inevitably gotten a warrant from Magistrate Judge Kemp and found the laptop and desktop computers pursuant to that warrant. (Gov't. Post-Hr'g Br. Opp'n, R. at 41).  Defendant argues that the facts of this case, as well as Sixth Circuit caselaw, do not support the application of the inevitable discovery doctrine.  (Def. Reply, R. at 43).

### 1.    Legal Standard for Applying the Inevitable Discovery Doctrine

The inevitable discovery doctrine is an exception to the exclusionary rule that permits the Government to introduce at trial unlawfully obtained evidence.  For the doctrine to apply, the Government must prove, by a preponderance of the evidence, that the evidence in question inevitably would have been discovered through other, lawful means.  Nix v. Williams, 467 U.S. 431, 444 (1984).  The Supreme Court justifies applying the inevitable discovery doctrine by reasoning that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discoverd by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received."  Id.  The

doctrine is designed to avoid "put[ting] the police in a worse position than they would have been in absent any error or violation." Id. at 443.

By its nature, the inevitable discovery doctrine requires a court to engage in a certain amount of speculation to determine what the government "inevitably" would have discovered absent the illegal conduct. This speculation, however, must be kept to a minimum, and courts must focus on "demonstrated historical facts capable of ready verification or impeachment." Id. at 444-45 n. 5.; United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999). The inevitable discovery doctrine "'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" United States v. Leake, 95 F.3d 409, 412 (6th Cir. 1996) (quoting United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992)).

The Sixth Circuit has stated that the inevitable discovery doctrine "applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995) (emphasis in original). An alternate, completely independent line of investigation need not exist for the inevitable discovery doctrine to apply, id. at 499-500, but the compelling facts supporting the inevitable discovery must be free of the taint of the illegal search. The existence of routine police procedures, such as inventory searches and searches incident to arrest, most commonly constitute a compelling fact in the inevitable discovery context. United States v. Garcia, 496 F.3d 495, 506 (6th Cir. 2007); Kennedy, 61 F.3d at 500. The existence and routine application of such procedures allows courts to minimize the speculation that Nix commands courts

31

to avoid and instead focus on facts more "capable of ready verification." Nix, 467 U.S. at 444-45 n.5.

### 2. Analysis

As straightforward as the inevitable discovery doctrine may appear to be, its application obviously is dependent upon the unique nature of each factual situation presented to a court. A court, in essence, faces a question of first impression unless it can find precedent dealing with virtually the same facts in the case before it. See United States v. Vite-Espinoza, 342 F.3d 462, 467 (6th Cir. 2003). In this case, the Court is presented with a unique factual scenario. However, recent Sixth Circuit caselaw sheds some light on how the law applies to these facts.

United States v. Bowden, 240 F. App'x 56 (6th Cir. Aug. 24, 2007) (unpublished)[13] involved a warrantless search of defendant Bowden's home, which was owned by Bowden's father, Cleveland. Bowden initially consented to a limited, walk-through search of the residence, during which officers found some indication of drug use. Id. at 57. The officers then requested Bowden's consent to a thorough search. Bowden refused and said he was leaving. The officers informed him that he could leave, but that they would secure his house and obtain a search warrant in his absence. Id. After Bowden left, one of the officers approached Cleveland, who consented to a search of the entire house except for Bowden's bedroom. The officers, reinforced by backup, began to search the house and, when Bowden reappeared, secured Bowden's consent to search his bedroom. After an officer found indications that Bowden was involved in selling drugs, Bowden revoked his consent

---

[13] Although citation to unpublished Sixth Circuit precedents is disfavored, in the absence of clear published case law from this Circuit, unpublished opinions may be relied upon for guidance. See Norton v. Parke, 892 F.2d 476, 479 n. 7 (6th Cir.1989). While this unreported Sixth Circuit decision is not binding, it is factually similar, and the Court finds Bowden to be particularly instructive.

to the search.  Id.  As one of the officers, Officer Beauchamp, was exiting the house, he first received

a call from other officers in the garage, and then passed Cleveland, who also revoked his consent

to the search.  Id. at *2.  At the garage, Officer Beauchamp learned that other officers had discovered

crack cocaine in a sock.  Officer Beauchamp determined that the cocaine had been found prior to

Bowden's or Cleveland's revocation of consent, and then secured the premises while the officers

obtained a search warrant.  The search pursuant to the warrant revealed a gun and over $15,000 in

cash.  Id. at 58.

Bowden moved to suppress the evidence on the basis that the officers did not properly obtain

consent to search.  In rejecting this argument, the Sixth Circuit discussed at length the application

of the inevitable discovery doctrine.  The Sixth Circuit noted that numerous Supreme Court and

Sixth Circuit cases had applied the inevitable discovery doctrine when "a potentially illegal search

is followed by a search conducted in accordance with a valid search warrant premised on evidence

of probable cause developed independently of the initial search."  Id. at 61 (citing Murray v. United

States, 487 U.S. 533, 541-43 (1988); Segura v. United States, 468 U.S. 796, 813-16 (1984); United

States v. Keszthelyi, 308 F.3d 557, 574 (6th Cir. 2002).  The Sixth Circuit in Bowden relied on the

fact that the officers had intended to and did actually obtain a search warrant for the property based

on information obtained independently of the illegal search.  The Sixth Circuit found that the

affidavit submitted in support of the search warrant, even when purged of any tainted information,

was sufficient to support a finding of probable cause to support the warrant, and thus the inevitable

discovery doctrine applied.  Id. at 62.

The Sixth Circuit was careful, however, to point out the limits of the inevitable discovery

doctrine.  After finding that the inevitable discovery doctrine applied, the Sixth Circuit stated that

> [d]oubtless, the inevitable-discovery doctrine does not permit police, who have probable cause to believe a home contains contraband, to enter a home illegally, conduct a warrantless search and escape the exclusionary rule on the ground that the police <u>could</u> [have] obtain[ed] a warrant yet cho[]se not to do so . . . We have not applied the doctrine to so-called "one search case[s]," in which the evidence was not independently discovered in connection with a <u>second search</u> pursuant to a valid warrant that was not tainted by the original search[.]

<u>Id.</u> at 63 (internal citations omitted) (emphasis in original). The Sixth Circuit also cited <u>United States v. Haddix</u>, 239 F.3d 766 (6th Cir. 2001), in which the Government argued that "the inevitable-discovery doctrine should apply whenever 'the police could have obtained a warrant but did not do so - that is, whenever probable cause would have existed had a magistrate considered the question in advance of the search.'" <u>Bowden</u>, 240 F. App'x at 63 (quoting <u>Haddix</u>, 239 F.3d at 768). The <u>Bowden</u> Court clarified by stating that

> [t]hat is not what the court means by inevitable discovery or inevitable non-discovery. Otherwise, as <u>Haddix</u> correctly observed, the warrant requirement would be "completely obviate[d]." What we mean by inevitable discovery is that the government obtained the evidence "through an independent source" . . . untainted by the initial illegal . . . search. Here [in <u>Bowden</u>], unlike <u>Haddix</u>, the government did not need to rely on evidence discovered on an allegedly illegal basis to support the warrant <u>it obtained</u>. The legal evidence the government previously had was sufficient to support the warrant and accordingly the inevitable-discovery doctrine applies.

<u>Id.</u> at 64 (internal citations omitted) (emphasis added).

With these considerations in mind, the Court returns to the instant case. The Government argues that the evidence it had immediately prior to the illegal search would have supported a finding of probable cause, and that the magistrate judge would have issued a telephonic search warrant. Thus, according to the Government, it was inevitable that the search would have occurred and the evidence discovered. A close examination of the relevant precedent, and especially <u>Bowden</u>, however, undermines the Government's argument.

34

Nix instructs courts to keep speculation to a minimum and instead rely on historical fact "capable of ready verification or impeachment." Nix, 467 U.S. at 444-45 n.5. In Bowden, the officers did in fact apply for and obtain a search warrant. Thus, the Sixth Circuit was able to review the probable cause affidavit and determine whether it would have been sufficient to support a magistrate's decision to issue a search warrant if the illegal search had never happened. The fact that the warrant and affidavit actually existed allowed the Bowden court to avoid the type of speculation that Nix condemns and instead rely on verifiable historical fact to conclude that compelling facts existed that established that the disputed evidence would inevitably have been recovered.

Not so in this case. Here, S.A. White, while he was discussing the procedure with the magistrate judge, clearly had not completed the actual process of applying for a telephonic search warrant, let alone secured one.[14] Obtaining a search warrant is not a "routine" police procedure, and arguing that the government "could" have obtained one cannot constitute a compelling fact for inevitable discovery purposes. See Kennedy, 61 F.3d at 499. Unlike inventory searches and searches incident to arrest that are performed without discretion or need for approval, obtaining a search warrant requires a neutral and detached magistrate to independently review an officer's

---

[14] For S.A. White to obtain a telephonic search warrant, Magistrate Judge Kemp would first have needed to call a court reporter or secure access to a recording device. FED. R. CRIM. P. 41(d)(3)(B). Next, S.A. White would have needed to prepare a "proposed duplicate original warrant," and then read that into the phone while Magistrate Judge Kemp recorded the coversation. Id. at 41(e)(3)(A). Magistrate Judge Kemp would then decide whether to authorize the warrant and, if so, would direct S.A. White to sign Magistrate Judge Kemp's name on the bottom of the duplicate original warrant. Id. at 41(e)(3)(D). S.A. White's testimony makes clear that the actual formal application had not yet begun, as Magistrate Judge Kemp was merely outlining the procedure and no recording had begun. (Suppression Hr'g Tr. p. 18, R. at 31; p. 102-3, R at 40).

probable cause determination and judge for himself or herself whether probable cause exists to support the search warrant. See Johnson v. United States, 333 U.S. 10, 13-14 (1948). One could argue that the process of applying for a search warrant could be considered a routine police procedure; however, actually obtaining one is not. Attempting to determine whether a magistrate would have inevitably granted the search warrant would be exactly the type of speculation that Nix teaches us to avoid.

Although S.A. White testified that he intended his probable cause affidavit for the New Lexington address to be substantially the same as the affidavit that supported the search warrant for the Roseville property, and that Magistrate Judge Kemp gave no indication that he would not grant the warrant (Suppression Hr'g Tr. p. 77, R. at 40; p. 27, R. at 31), it does not follow that the prior affidavit would automatically support a search warrant for a new address. This Court is unwilling to make a speculative determination that the same or similar affidavit would inevitably lead to a magistrate judge issuing a search warrant. In fact, the Roseville search warrant was based entirely on the investigation that showed, by means of telephone records, that the use of the internet for pornographic purposes came from the Roseville address and not from the New Lexington address. The record does not contain what, exactly, S.A. White may have said to Magistrate Judge Kemp, and the Court refuses to speculate regarding this information or whether Magistrate Judge Kemp, based on that information, would have issued a search warrant for the New Lexington residence.

The Government argues that application of the exclusionary rule here would put the Government in a worse position, rather than the same position, than it would have been in had the original search never happened. Nix makes clear that the inevitable discovery doctrine is designed to avoid "put[ting] the police in a worse position than they would have been in absent any error or

36

violation." Nix, 467 U.S. at 443.  But this is not the case.  At the instant before the search, sitting on top of the hill, S.A. White had evidence that Defendant owned a laptop computer that he used to post images of child pornography with at the Roseville property, that Defendant was not at his Roseville property and a search did not uncover the laptop, and that Defendant owned the New Lexington property.  (Gov't. Post-Hr'g Br. p. 12, R. at 41).  What S.A. White did not know, however, was whether a magistrate judge would find that he had probable cause to support a search warrant for the New Lexington property.  He may have thought a magistrate judge would so find, but the undeniable fact is that no such determination was ever made.

The Court notes that, to support a search warrant, "the affidavit must suggest 'that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of property is suspected of crime.'" United States v. Kenny, – F.3d –, –, No. 05-2195, 2007 WL 2935016, *1 (6th Cir. Oct. 10, 2007) (quoting United States v. McPhearson, 469 F.3d 518, 524 (6th Cir. 2006)).  There is no clear indication as to what would support S.A. White and the officers' "reasonable cause to believe" that Defendant's New Lexington property or any computers therein had any connection to Defendant's illegal internet activity.  Officers had verified that the laptop had specifically been used at the Roseville property to post images of child pornography.  Not so for the New Lexington address, which was never connected to Defendant's online activity.  (Suppression Hr'g Tr. p. 116, R at 40).  S.A. White's testimony that Defendant had been at the Roseville property that morning does not create such a connection, because S.A. White had no way of knowing whether Defendant had been using his laptop to access child pornography at the Roseville address that morning.  Without such a "nexus" between the laptop and the New Lexington property, see United States v. Carpenter, 360

F.3d 590, 594 (6th Cir. 2004) (en banc), it is certainly not inevitable that a magistrate judge would have issued a search warrant for the New Lexington property.[15]

The facts of this case lean too close to the situation the Sixth Circuit disapproved of in Bowden. Even if S.A. White and the other officers that searched Defendant's home did indeed have probable cause, an issue as to which the Court has expressed doubts, they never obtained a subsequent search warrant, from a neutral and detached magistrate, free of the taint of the original search. Without obtaining such a warrant, the Government is simply attempting to circumvent the Fourth Amendment's warrant requirement by substituting S.A. White's determination that he had probable cause to support a search warrant for a magistrate's neutral and independent determination of that issue. As the Haddix court correctly noted, "this is untenable. . . . The warrant requirement is at the very heart of the Fourth Amendment, and [] judicial exceptions to it are only exceptions." Haddix, 239 F.3d at 768; see also Vale v. Louisiana, 399 U.S. 30, 34 (1970) ("Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant"). The Government's inevitable discovery argument must fail.

_____

[15] The Government also argues that, "[a]side from obtaining a federal search warrant, the other possibilities showing inevitable discovery of the evidence are: 1) that the local police would have sought a search warrant since the facts also indicated a violation of state child pornography laws and state law enforcement personnel were present; 2) that defendant Jones' spouse would have been asked for consent to search; 3) that child welfare investigators, who are called whenever children are present in a child pornography investigation and were in fact called in this investigation, would have followed up on the interviews of the family; or 4) that agents would have searched the vehicles under the warrantless search exception." (Gov't. Reply p. 14-15, R. at 44). Arguments 1) and 2) are even more speculative than the main argument, and do not support inevitable discovery. Argument 3) fails to realize that child welfare investigators were only called after the illegal search occurred - at the instant before the search, when S.A. White was sitting on top of the hill, calling child welfare investigators was not an option. Argument 4) has already been rejected.

**III.    Conclusion**

The Court finds that 1) Defendant did not voluntarily consent to the law enforcement officers' search of his house and vehicles at 4171 Pike Township Road 223, New Lexington, Ohio on July 25, 2006; 2) the automobile exception does not apply in this case because Defendant's automobile was within his home's curtilage; and 3) the inevitable discovery doctrine does not apply in this case.  Consequently, because they were conducted without the authority of a warrant, neither the search nor the seizure of property by the officers was permissible under the Fourth Amendment. Because the search of the New Lexington property was illegal, the exclusionary rule dictates that evidence seized in violation of the Fourth Amendment be deemed inadmissible at trial. Accordingly, Defendant's Motion to Suppress Physical Evidence Seized from Both His Home and Vehicle (R. at 22) is **GRANTED**.

**IT IS SO ORDERED.**


Date: November 27, 2007                                        **/s/ John D. Holschuh**
                                                              John D. Holschuh, Judge
                                                              United States District Court